415 A.2d 4

COMMONWEALTH of Pennsylvania,

v.

Joseph FONTANA, Appellant.

Supreme Court of Pennsylvania.

Argued March 7, 1980.

Decided April 30, 1980.

Reargument Denied June 24, 1980.

Irving M. Green, New Kensington, for appellant.

Samuel J. Orr, IV, Dist. Atty., David B. Douds, Asst. Dist. Atty., Mercer, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

LARSEN, Justice.

Appellant, an independent general contractor, was tried with three other defendants, all employees of the Pennsylvania Department of Transportation (PennDot), for various crimes involving the theft and subsequent resale of a Case hi-lift from the Mercer County maintenance garage of Penn-Dot. A jury convicted appellant of receiving stolen property, 18 Pa.C.S.A. § 3925, misapplication of entrusted property and property of government institutions, 18 Pa.C.S.A. § 4113, tampering with a witness, 18 Pa.C.S.A. § 4907, and criminal conspiracy, 18 Pa.C.S.A. § 903.

Following his conviction, appellant obtained new counsel who filed post-verdict motions asserting trial counsel's inef-

fectiveness and challenging the sufficiency of the evidence. The Court of Common Pleas of Mercer County denied the motions and, on appeal, the Superior Court affirmed. This Court granted appellant's petition for allowance of appeal.

Viewing the evidence, and all reasonable inferences therefrom, in the light most favorable to the Commonwealth, as verdict winner, *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282, (1976), the following facts and events appear of record. In January of 1975, appellant purchased the Case hi-lift in question from a gambling acquaintance, one "Rags" Rogozan, an employee of PennDot who was not authorized to sell such equipment. The purchase price was $500.00 plus the cancellation of a $400.00 gambling debt Rogozan owed appellant, which purchase price was substantially less than half the fair market value of the hi-lift. The day Rogozan delivered the hi-lift—bearing PennDot markings and paint—to appellant at the Sheraton Inn in West Middlesex,[1] two men, at appellant's behest, took the hi-lift to an airport hangar to make some minor repairs, to steamclean, and to paint it a different color.

This accomplished, the hi-lift was then brought back to the Inn, where it remained until April of 1975. At that time, appellant resold the hi-lift to Mr. Stephen Levitt of the American International Coal Company, for $2,500.00.

When appellant became aware, in July of 1975, that an investigation into the theft of the hi-lift was underway, he initiated a "cover-up" of his part of the transaction. This "cover-up" included requesting one witness to refrain from testifying,[2] requesting Mr. Levitt to destroy the cancelled check for $2,500.00 (used to purchase the hi-lift) as well as his bank's microfilm record of the check, and a request that Mr. Levitt "dump" the hi-lift in the river. This evidence was sufficient to prove appellant's guilt of the crimes charged beyond a reasonable doubt.

1. Appellant was the general contractor for construction of the Inn.

2. The witness was James Joiner, one of two men who helped to load the hi-lift onto a truck for delivery to American International.

10

Appellant next argues that he received ineffective representation by his trial counsel, because of an asserted conflict of interests. The circumstances surrounding these assertions are as follows:

In May of 1975, James Joiner was helping appellant load the hi-lift onto a flat-bed truck at the Sheraton Inn for delivery to American International. Present at the Inn were Mr. Joiner, a Russell Reed, appellant, and appellant's trial counsel, James Joseph. Mr. Joiner overheard a remark about a "hot something," but did not hear the entire conversation or the context in which the remark was made. Counsel was seated in appellant's car when this remark was made.

On July 16, 1975, after appellant became aware of the investigation, he met with Messers. Levitt and Reed at a parking lot in Pittsburgh. At this time, appellant discussed with Levitt the possibility of destroying the check, and of obtaining the microfilm record of the check from the bank and destroying it. Levitt declined.

Immediately thereafter, appellant arranged a meeting between Levitt, Reed and himself at attorney Joseph's Pittsburgh office, located minutes away. At this meeting, the discussion focused on Mr. Levitt's anticipated testimony when and if he was subpoenaed by a grand jury. Levitt testified appellant admitted at this meeting that he purchased the hi-lift from Rogozan in payment of a gambling debt. Mr. Levitt also testified there was no attempt at that meeting to influence his testimony, or to fabricate an explanation for the hi-lift transaction. At trial, counsel twice attempted to place into record the advice which he gave to appellant and Levitt at the July 16th meeting by asking Mr. Reed and appellant what had been said. Twice his attempts were thwarted by timely hearsay objections. Notes of Testimony, r. 1033a and r. 1110a.

Appellant's counsel was also involved in some questionable activity regarding payment for the hi-lift. Appellant had initially requested Mr. Levitt to pay him in cash. When Mr. Levitt responded he would have to pay by check, appellant

agreed to accept the check, but he instructed Levitt not to put his (appellant's) name on the check as payee. Instead, Mr. Levitt was to leave the payee blank and to deliver the check to appellant's attorney's office and "they would make it out to whomever it was to go to." Notes of Testimony, r. 543a, r. 555a–r. 557a. When the cancelled check was returned from the bank, Mr. Joseph's office had completed it by filling in the name of another attorney, George Ewing, as payee.

The trial judge and the various counsel for the other defendants became concerned about attorney Joseph's continued representation of appellant because, as the foregoing testimony demonstrates, Mr. Joseph was a material witness to at least some of the events which culminated in appellant's arrest and trial.[3] Nevertheless, the court did not require Mr. Joseph to withdraw from the case.

■ We agree with appellant that the testimony indicating counsel's personal involvement in the case creates a strong appearance of a conflict between his client's interests and his own—this apparent conflict rendered attorney Joseph's representation ineffective. If counsel's testimony would have tended to exculpate his client,[4] then certainly he had the obligation to his client to take the witness stand in his behalf. If, on the other hand, counsel's testimony would have tended to incriminate appellant, then under the circumstances presented here it would also have tended to impli-

3. Defense counsel Joseph P. Valentino, voiced his opinion there was a "very serious question as to the breach of the canon of ethics as to whether or not he [Mr. Joseph] should even be involved in the case as a lawyer." Notes of Testimony, r. 614a. The trial judge replied "With that I agree. I read him the canon of ethics and I can't conceive of a lawyer who is a witness in a case acting as a lawyer. But I don't control the ethics of the Bar of Pennsylvania, if I did there would be a good many less lawyers practicing in the state." *Id.* And, "I couldn't believe . . . a Mercer County lawyer would be a witness in a case, an obvious witness in a case and then come up and sit in as their attorney and act as if there was no ethics problem at all."

4. *E. g.* by corroborating Mr. Levitt's testimony that he knew of no attempt to fabricate a "cover-up"—such corroboration would not have been merely cumulative.

cate counsel—obviously this situation would create a conflict preventing or substantially hindering, counsel from providing the "zealous advocacy to which appellant is entitled." *Commonwealth v. Patrick*, 477 Pa. 284, 287, 383 A.2d 935, 936 (1978). In either event, appellant did not receive effective assistance of counsel.

Canon V of the Code of Professional Responsibility provides "A lawyer should exercise independent professional judgment on behalf of a client." The Ethical Considerations illustrate interests that may affect an attorney's judgment. EC 5–9 provides:

> Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. . . . An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. *The roles of an advocate and of a witness are inconsistent* . . . . (emphasis added)

Further, EC 5–10 provides:

> It is not objectionable for a lawyer who is a potential witness to be an advocate *if* it is unlikely that he will be called as a witness *because his testimony will be merely cumulative or if his testimony will relate only to an uncontested issue. In the exceptional situation where it will be manifestly unfair to the client for the lawyer to* . . . *withdraw* when he will likely to be a witness on a contested issue *he may serve as advocate* even though he may be a witness. In making such decision, *he should determine* . . . *[inter alia]* the materiality of his testimony, and *the effectiveness of his representation in view of his personal involvement.* . . . *Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his* becoming or *continuing as an advocate.* (emphasis added).

Moreover, in order to prevent further erosion of dwindling public confidence in our legal system, and those who are its principal participants, "a lawyer should avoid *even the appearance* of professional impropriety." Canon IX, Code of Professional Responsibility and EC 9–2. Under the facts

and circumstances of this case, the *appearance of a conflict of interest* required trial counsel to withdraw from the case. Such appearance is fundamentally at odds with the concept of effective advocacy.

In analogous situations, where a conflict of interest arises because of dual representation of multiple defendants, we do not require a demonstration of actual prejudice to the defendant. *Commonwealth v. Wilson*, 429 Pa. 458, 240 A.2d 498 (1968). It is the *potentiality* of the harm, and the difficulty of proving actual prejudice resulting from the conflict,[5] that prompted us to hold "once a conflict of interest arises, a criminal defendant is entitled to be represented by counsel unburdened by a conflict." *Commonwealth v. Westbrook*, 484 Pa. 534, 542, 400 A.2d 160, 164 (1979) (four justices concurring that actual harm need not be shown; Larsen, J., dissenting on grounds no conflict existed). As the United States Supreme Court has stated in no uncertain terms, "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S. 60, 75–76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). *See also,* American Bar Association Project on Standards Relating to Criminal Justice, Standards Relating to the Defense Function, § 3.5 Conflict of Interest; *and see, Commonwealth v. Fox*, 476 Pa. 475, 383 A.2d 199 (1978) (appearance of conflict where one

---

**5.** *See e. g., United States ex rel. Sullivan v. Cuyler*, 593 F.2d 512, 520 (3rd Cir. 1979):

after the fact it is often difficult or impossible to determine whether a defendant has been prejudiced by dual representation. Dual representation interferes with an attorney's independent professional judgment. The harm is often in what it tends to prevent an attorney from doing on behalf of his client. *Holloway v. Arkansas*, 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). For example, an attorney with divided loyalties cannot negotiate a plea agreement on behalf of one client which includes an agreement by that client to testify against a co-defendant the attorney also represents. *Id.* He may refrain from introducing evidence favorable to one client but harmful to another; or he may refrain from challenging evidence that harms one client but is helpful to another. These and similar conflicts of interest ordinarily do not appear in the record.

public defender argues the ineffectiveness of an associate public defender inhibits the zealous advocacy to which a defendant is entitled) *and Commonwealth v. Gardner,* 480 Pa. 7, 389 A.2d 58 (1978) (same). Surely, the protections afforded a defendant by the constitutional right to counsel in the dual representation cases, apply with *greater force* where the conflict arises because of counsel's *personal* involvement.

Accordingly, the judgments of sentence are reversed and the case remanded.

ROBERTS, J., filed a dissenting opinion.

NIX, J., filed a dissenting opinion.

KAUFFMAN, J., filed a dissenting opinion.

ROBERTS, Justice, dissenting.

I dissent. Like the unanimous Superior Court, I fail to see on this record how appellant in any respect can obtain a new trial on the ground that his privately-retained counsel did not testify at trial. It is for the defendant and counsel to decide whether counsel should refrain from testifying. See *Commonwealth v. Gatewood,* 221 Pa.Super. 399, 293 A.2d 80 (1972). Here, the record is clear that, despite any ethical considerations, retained counsel knowingly chose not to testify on appellant's behalf. And appellant in no way even suggests either that he was unaware of his right to call retained counsel as a witness or that retained counsel declined such a request. Hence, unlike the majority, I would affirm the order of the Superior Court affirming judgment of sentence.

NIX, Justice, dissenting.

The majority's conclusion that appellant is deserving of a new trial because of a conflict between the trial attorney and the client thus depriving appellant of effective assistance of counsel is a figment of the imagination, totally unwarranted under the facts on this record. The majority first speculates that counsel possessed information which

may have exculpated the client. Counsel has not testified to this fact nor has appellant asserted that this was the case. In any event, it is obvious that whatever information trial counsel may have been privy to, neither he nor his client was anxious to have it offered during the course of the trial.[1]

Absent a showing that counsel possessed facts which would have been of benefit to the defense, and that testimony could not be and was not introduced because of the attorney-client relationship, there is no basis for concluding a conflict existed resulting in the ineffective assistance of trial counsel. The alternative hypothesis of the majority is equally specious. Assuming arguendo, that trial counsel shared some guilty knowledge with appellant, I find it difficult to jump from that premise to the conclusion that counsel's zeal in his client's behalf would necessarily be diminished. To the contrary, such an affinity would be likely to provide an increased desire to achieve a favorable result for the client.

Since the majority has seen fit to refer to the "further erosion of dwindling public confidence in our legal system" (Slip opinion, page 7), if such a trend is present, and I do not accept that it exists, decisions such as this would provide some justification for that loss of confidence. In my opinion allocatur should not have been granted in this case since the issues were properly decided below and the appeal should be dismissed as improvidently granted.

KAUFFMAN, Justice, dissenting.

I would remand this matter to the trial court for an evidentiary hearing on the question of privately retained

---

1. The majority attempts to bolster its fantasy by directing attention to counsel's efforts to elicit during trial from a Mr. Reed and appellant certain advice counsel had given to his client in the course of a conference. This testimony was properly excluded as hearsay. This "significant incident" ignores that counsel's evidence as to what he said on that occasion, if offered, *would also have been subject to the same objection.* Nor can we conclude from this that counsel possessed knowledge of the facts of the case which might have substantially aided his client's cause.

16

trial counsel's alleged ineffectiveness. See *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).

### DISSENTING STATEMENT

ROBERTS, NIX and KAUFFMAN, JJ., dissent from the denial of reargument, adhering to the views, expressed in their dissenting opinions, that on this record there is no basis for the majority's holding that a conflict of interest existed between the defendant and his retained trial counsel. Being of the view that the majority committed manifest and serious error in granting a new trial, we believe that at the least, the Commonwealth's application for reargument should be granted.

Filed: June 24, 1980.